# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**EDDIE GILL,**

      Plaintiff,

-vs-                                      Case No. 15-C-587

**CITY OF MILWAUKEE, et al.,**

      Defendants.

## DECISION AND ORDER

Eddie Gill brings a series of federal and state law claims against the City of Milwaukee, Chief of Police Edward Flynn, and six Milwaukee police detectives. One of those detectives, Detective Mark Peterson, moves for judgment on the pleadings. Fed. R. Civ. P. 12(c). For the reasons that follow, this motion is granted.

## Background

Eddie Gill was charged with the February 3, 2013 homicide of Jordin Crawley. Gill confessed to the murder and spent just over a year in jail pending trial. Gill was never tried, however, at least partly because Milwaukee County Circuit Court Judge Stephanie Rothstein suppressed Gill's confession. At the time of his arrest, Gill was an 18-year-old ninth grader diagnosed with ADHD, functionally illiterate, and borderline mentally retarded.

The background that follows is derived from the allegations in the complaint, *see Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (courts "take the facts alleged in the complaint as true, drawing all reasonable inferences in favor of the plaintiff" when ruling on a Rule 12(c) motion); the February 24, 2014 suppression hearing conducted by Judge Rothstein, *see Scherr v. Marriot Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) (courts "may take judicial notice of documents that are part of the public record, …"); the transcript and interview incident report of Detective Peterson's February 13, 2013 interrogation of Gill, *see id.*; *see also 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim"); and various other documents that are either public records, referenced in the complaint, or both.

The Futuristic Lounge, a tavern located on 18th Street and Greenfield Avenue in Milwaukee, was set to close for good on February 3, 2013. Among those in attendance for its last night were Gill, Crawley, Berry Dytrail, Sheontae Kennedy, and Ashley Hanson. At approximately 1:30 a.m., the bar turned on its lights and began asking its patrons to leave. Around this same time, Gill and Hanson exited the tavern after Kennedy was removed due to an altercation with another guest over a spilled drink. A large crowd, approximately thirty to fifty people, milled outside of the Futuristic Lounge as

it closed.

At 2:15 a.m., across the street from the Futuristic Lounge, a group of men in a green SUV pulled into a gas station. Gill recognized his friend Marcus Parker among those men. Gill, along with Hanson, walked across the street to the gas station. Gill told the group that Kennedy wanted to fight and that he wanted to "go box." Gill and the group followed Hanson back to the crowd. At 2:17 a.m., gunshots were fired, hitting Dytrail and Crawley. Dytrail survived but Crawley was pronounced dead at the scene.

Police officers began arriving on the scene at 2:22 a.m.. In the days that followed, MPD detectives interviewed approximately twenty fact witnesses regarding the night of the shooting. One witness was Tromain Collier, who identified Gill from security video footage of the gas station parking lot. Detective Peterson spoke with Gill over the phone and left his business card and contact information with Gill's mother, Sandra Deberry.

At approximately 7:30 p.m. on February 12, 2013, Gill voluntarily came to the Milwaukee Police Administration Building to be interviewed. Detectives Timothy Graham and Erik Gulbrandson conducted the interview. During the course of the interview, Gill's recollection of the night of the shooting was inconsistent. For example, Gill said he was not upset immediately before the shooting when the video clearly showed that he was upset; that he only met up with one person at the gas station when the video showed him conversing

with several people at the gas station; that he was standing at one location before the shooting when he was clearly standing somewhere else; and that there were not any problems inside the bar, but later stated that he got into an argument with a woman over a spilled drink. Accordingly, Detectives Graham and Gulbrandson arrested Gill for obstruction.

Detectives Graham and Gulbrandson read Gill his *Miranda* rights, at which time Gill requested a lawyer, which ended the interrogation. While being transported to booking, Gill expressed a desire to take a polygraph test and that he wished to waive his right to a lawyer in order to do so. The next morning at approximately 7:00 a.m., Gill was awakened in his cell by Detective James Hensley for his polygraph. Prior to the examination, Detective Hensley reiterated that Gill could not have the polygraph without a lawyer, unless he waived his right to a lawyer. Gill alleges that he interpreted this to mean that either he could have a polygraph without a lawyer or he would not get a polygraph at all. At 7:40 a.m., Detective Hensley began administering the polygraph. The examination concluded at 2:20 p.m..

At approximately 2:53 p.m., Detectives Peterson and Billy Ball began to interrogate Gill. After being read his *Miranda* rights, Gill spoke to the officers and denied being involved in the shooting. The next morning, Detective Hensley interrogated Gill once again. Detective Hensley employed various interrogation techniques, including social isolation, confrontation,

theme development, and minimization. According to the complaint, Detective Hensley falsely stated that Gill was identified as the shooter by an eyewitness. Hensley also coerced Gill to waive his right counsel. Over the course of the interrogation, Gill professed his innocence more than 140 times, but in the end, he gave in and confessed. Gill was charged with First Degree Reckless Homicide.

On February 20, 2014, Judge Rothstein learned that Detectives Peterson and DeValkenaere each had filed an incident report of witness interviews conducted over a year earlier. Detective Peterson's report was generated from an interview with a witness named Thomas Klitzka. On February 21, 2014, Judge Rothstein held a hearing to discuss the delayed disclosure of these interview reports. Detective Peterson's explanation for the delay was that it was an error on his part due to the volume of cases he was working.

On February 24, 2014, Judge Rothstein held a hearing regarding Gill's motion to suppress his murder confession. Judge Rothstein determined that Gill's arrest was "an appropriate exercise of … authority" in light of the "inconsistencies" in Gill's interview answers. Judge Rothstein also concluded that Gill knowingly and intelligently waived his right to counsel on February 12, 2013. However, Judge Rothstein found that Gill did not understand whether he had a right to counsel before choosing to take the polygraph

examination. Thus, the "statements that were made beginning in the morning of February 13, 2013, and forward" were "not admissible" and "were not voluntary and his request for counsel was not scrupulously honored. Therefore, those statements will be suppressed for use by the state in their case-in-chief." In light of this ruling, the state chose not to proceed, the case was dismissed, and Gill was released from custody.

## Analysis

To survive a motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court accepts the well-pleaded allegations as true and draws all reasonable inferences in favor of Gill, the non-moving party. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).

Peterson contends that he is entitled to qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether a state official is entitled to

- 6 -

qualified immunity, the Court asks (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013). A right is "clearly established" if "the contours of that right are sufficiently clear that a reasonable officer would understand that his actions violate that right – in other words, existing precedent must have placed the constitutional questions beyond debate." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015) (quoting *Reichle v. Howard*, --- U.S. ----, 132 S. Ct. 2088, 2093 (2012)).

First, Gill alleges that the defendants coerced a false confession using conscience-shocking behavior. "The Supreme Court has recognized that police conduct that 'shocks the conscience' supports a due process claim under § 1983 …, and we have acknowledged that a free-standing due process claim may succeed in a situation involving conscience-shocking interrogation tactics, …" *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (internal citations omitted). There is "no clear-cut analysis to determine what constitutes 'conscience-shocking' conduct; the question is whether the conduct is 'too close to the rack and the screw.'" *Fox*, 600 F.3d at 841 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). For example, forcing "an emetic down a person's throat to forcibly extract evidence from a suspect's stomach shocks the conscience," but

- 7 -

"lying to, threatening, or insulting a suspect does not, …" *Id.* (citing *Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005)).

Peterson did not procure Gill's confession. It was Detective Hensley who, according to the complaint, "employed various techniques including social isolation, confrontation, theme development, and minimization to obtain" Gill's confession. Complaint, ¶ 31. This is not to say that the complaint states a claim against Hensley, but not Peterson. On the other hand, if Hensley did not engage in "conscience-shocking" behavior – the Court expresses no opinion on whether he did or did not – then neither did Peterson. Compared to Hensley, Peterson treated Gill with kid gloves.

Indeed, the transcript reveals that Peterson utilized ordinary interrogation tactics:

> DETECTIVE PETERSON: … You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to consult with a lawyer before questioning, have a lawyer present with you during – if you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before and during question [if] you so with. If you decide to answer the questions now without a lawyer present – remain silent at any time you wish, the right to ask to have a lawyer any time you wish during questioning. Do you understand each of these rights – make a statement. Basically you're saying it's okay.
>
> MR. GILL: Yeah.
>
> DETECTIVE PETERSON: You can stop it whenever you want. So it's okay for me to talk to you?

MR. GILL: Yeah.

DETECTIVE PETERSON: Okay.

Peterson explained at the suppression hearing: "After reading his rights, I looked at Mr. Gill. Mr. Gill looked at me. I wanted to make sure he understood each of the rights that were being read to him. I explained to him after reading his rights that he had pretty much to pick and choose whatever questions he wanted to ask or answer and that he could stop at any time he wanted."

Gill argues that Peterson's behavior "shocks the conscience" because Peterson exploited Gill's obvious and known intellectual limitations. This is not enough to state a claim for the violation of a clearly established right. The Supreme Court has "never held" that "police can render a waiver of *Miranda* rights involuntary simply by failing to take 'special care' that a suspect with a mental disability understands his rights." *Collins v. Gaetz*, 612 F.3d 574, 586 (7th Cir. 2010). If the failure to take "special care" is not enough to render a *Miranda* waiver involuntary, it certainly is not enough to meet the very high threshold of behavior that "shocks the conscience." *See also Young v. Walls*, 311 F.3d 846, 850 (7th Cir. 2002) ("It is sufficient [for *Miranda* purposes] if the suspect has enough mental capacity to make decisions in daily life").

Second, Gill alleges that Peterson caused his wrongful arrest and detention by eliciting a false confession. Peterson, however, did not place Gill

- 9 -

under arrest *or* elicit his confession. Even if the complaint plausibly alleged that Peterson was involved in these incidents, Gill does not dispute (as Judge Rothstein concluded) that there was probable cause to arrest Gill for obstruction. *Stokes v. Bd. of Ed. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010) ("Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983"). Gill's argument about the lack of probable cause to arrest him for murder is misplaced because Gill was not released and then re-arrested. Instead, Gill remained in custody until he confessed. The existence of probable cause at the outset precludes any claim for false arrest. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause") (emphasis in original). Gill also cannot shoehorn his false confession claim into the Fourth Amendment context. *See Wallace v. City of Chi.*, 440 F.3d 421, 429 (7th Cir. 2006) ("We reject the idea of a stand-alone 'false confession' claim based on the Fourth Amendment, rather than the Fifth Amendment or the due process clauses").

Third, Gill argues that Peterson violated due process by concealing exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon

- 10 -

Case 2:15-cv-00587-RTR   Filed 11/09/15   Page 10 of 13   Document 28

request violates due process where the evidence is material either to guilt or to punishment, …"). Setting aside the issue of whether the Klitzka interview report was actually exculpatory,[1] Gill's *Brady* claim cannot survive because Gill was never prosecuted. *See Ray v. City of Chi.*, 629 F.3d 660, 664 (7th Cir. 2011) (no *Brady* claim "when the individual is merely charged with a crime, but never fully prosecuted"). The Seventh Circuit has "entertained the possibility that prejudice could be established if an *acquitted defendant* showed that disclosure of the suppressed evidence would have altered the decision to go to trial." *Alexander v. McKinney*, 692 F.3d 553, 556 (7th Cir. 2012) (emphasis added). That scenario is different than the one at issue here because the case against Gill was never brought to trial. Of course, any uncertainty over whether such a claim is viable – with or without a trial – demonstrates the absence of a clearly established constitutional right.

Fourth, Gill alleges the defendants conspired to violate his constitutional rights. Peterson argues that this claim should be dismissed because conspiracy "is not an independent basis of liability in § 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Instead, "an actual denial of a civil right is necessary before a cause of action [for conspiracy] arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). Gill has failed to

---

[1] Klitzka stated that he was at the gas station when the homicide occurred, but did not know where Gill was located and did not see Gill when the shots were being fired.

- 11 -

state a plausible claim for relief against Peterson, but Peterson could still be liable in conspiracy if any of the remaining defendants violated Gill's constitutional rights. *See, e.g., Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1077 (N.D. Ill. 2014) (rejecting the argument that state actors can never be liable under § 1983 for conspiring with each other) (discussing *Logan v. Wilkins*, 644 F.3d 577, 583 n.1 (7th Cir. 2011)).

For the reasons already stated, Gill cannot state a false arrest claim, nor can he state a *Brady* claim. This analysis applies across the board, as a matter of law, to all of the defendants in this case. Therefore, Gill cannot state a conspiracy claim with respect to Counts II and III. As to Count I – the coercive investigation claim – the complaint generically alleges that the defendants "reached an agreement amongst themselves to coercively interrogate [Gill] in an extreme and outrageous manner." Complaint, ¶ 73. This is an insufficient allegation grounded in "collective responsibility." "Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Put another way, Gill fails to plausibly allege that Peterson helped, assisted, or otherwise conspired with any other defendant to coercively interrogate Gill.

Fifth, Gill alleges that the defendants failed to intervene to prevent the

- 12 -

violation of his constitutional rights. As the complaint makes clear, Peterson was not present when Gill confessed to Detective Hensley. Peterson cannot be liable for failing to stop a violation of which he was not aware. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (explaining duty to intervene to stop violation in an officer's presence "or otherwise within his knowledge").

Finally, Gill brings a state law negligence claim against Peterson. The Court will relinquish jurisdiction over this pendent party claim. *RWJ Mgmt. Co., Inc. v. BP Products N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) ("when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Peterson's motion to strike Gill's sur-reply letter [ECF No. 27] is **DENIED**; and

2. Peterson's motion to dismiss [ECF No. 17] is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 9th day of November, 2015.

**BY THE COURT:**

*/s/ Rudolph T. Randa*

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**